**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 3, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

     No. 25-7031

STEVEN DEWAYNE BEARD,

     Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:23-CR-00194-RAW-1)**
_____

Neil D. Van Dalsem, Office of the Federal Public Defender, Muskogee, Oklahoma (Scott A. Graham, Federal Public Defender, and Barbara Lauren Woltz, Assistant Federal Public Defender, on the briefs) for Defendant-Appellant.

Linda A. Epperley, United States Attorney's Office, Muskogee, Oklahoma (Christopher J. Wilson, United States Attorney, and Kevin Gross, Assistant United States Attorney, on the brief) for Plaintiff-Appellee.
_____

Before **MATHESON**, **EBEL**, and **CARSON**, Circuit Judges.
_____

**CARSON**, Circuit Judge.
_____

The jury exclusively appraises credibility, weighs testimony, draws inferences from evidence presented, and reaches ultimate conclusions of fact at trial. By

necessity, then, we review these determinations in a highly deferential manner and consider all evidence and inferences in the light most favorable to the jury's verdict.

In this case, the jury heard competing narratives about an incident that ended when Defendant Steven Beard shot and killed a romantic rival, Michael Ingram, outside of his trailer. Defendant claimed self-defense. The government theorized that Defendant had set a trap for Ingram and killed him out of jealousy. The jury accepted the government's version of events and convicted Defendant of murder, of using, carrying, brandishing, and discharging a firearm in relation to a crime of violence, and of causing death with a firearm. Defendant challenges his convictions and sentence on appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

This case involves a love triangle between Ingram, Ashton Meigs, and Defendant that ended when Defendant shot and killed Ingram on March 29, 2023.[1] For about twelve years before this shooting, Meigs and Ingram were in an intimate relationship. Defendant and Ingram were also friends. Ingram introduced Defendant to Meigs in Fall 2022.

Eventually Meigs began seeing both men simultaneously. The two men became jealous of one another and had several confrontations. During some of these incidents, Ingram acted violently or aggressively toward Defendant.

---

[1] Because Defendant appeals from the jury's verdict against him, we must interpret the evidence in the light most favorable to the government. United States v. Christy, 916 F.3d 814, 843 (10th Cir. 2019) (citing United States v. Poe, 556 F.3d 1113, 1124 (10th Cir. 2009)). Our recitation of the facts reflects this principle.

The tensions boiled over on the day of the shooting.  After spending most of the day with Defendant, Meigs went with Ingram for the evening.  This upset Defendant, who told Meigs to "come get all of [her] shit"—meaning items she kept in Defendant's trailer including a cat cage, hygiene products, clothes, and a puzzle.  Defendant told Meigs he was leaving to visit her cousin and "peeled out."  Rather than visiting Meigs' cousin, however, Defendant returned to his trailer.  And rather than park in his normal spot out front, Defendant parked behind his trailer in a spot not readily visible.

Shortly after Defendant returned home, Meigs and Ingram arrived to collect Meigs' things.  Meigs thought Defendant was gone because he had told her he was going to her cousin's and because he was not parked in his usual spot.  Defendant had locked the door to his trailer, and Meigs had misplaced her key.  But Meigs and Defendant regularly used a screwdriver to pry the door open. Meigs and Ingram tried to open Defendant's trailer door that evening with a screwdriver or a crowbar.

Defendant heard Ingram and Meigs outside of his trailer.  He picked up a shotgun he had obtained earlier that day and walked toward the door.  Within two seconds of the door opening, Defendant shot Ingram.  Video surveillance footage shows Ingram raising his hands, with palms facing out toward Defendant, just before Defendant shot him:

3



Gov't Exhibit 194 at 00:34.

Ingram fell to the ground and Meigs climbed on top of him to attempt CPR. While she did so, Defendant reloaded the shotgun. Despite Meigs covering nearly the entirety of Ingram's upper body as he lay motionless on the ground, Defendant walked over to Ingram, placed his shotgun directly onto Ingram's chest, and shot him again from point-blank range.

The government charged Defendant for murder in Indian country in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153 ("Count One"). The government also charged Defendant for using, carrying, brandishing, and discharging a firearm during

and in relation to a crime of violence under 18 U.S.C. § 924(c) ("Count Two"), as well as for causing death with a firearm under 18 U.S.C. § 924(j) ("Count Three").

At trial, the jury heard competing narratives about the shooting. The government characterized the events as a premeditated murder born of jealousy. The government told the jury that Defendant laid a trap for Ingram by telling Meigs to go to his trailer to get her things and that he would not be there. Rather than park in his usual spot, Defendant hid his truck behind the trailer so Ingram and Meigs would believe he was not home. He then shot and killed his romantic rival. Defendant claimed he acted in self-defense. He argued that Ingram and Meigs were breaking into his home, and that he was terrified of Ingram. Defendant knew Ingram often carried a gun and he had been violent toward Defendant in the past. Defendant further claimed that his truck had broken down behind his trailer and that he had not tried to hide it from Ingram and Meigs.

The jury returned a verdict finding Defendant guilty of counts one through three. Before sentencing, the government asked the district court to dismiss the count based on causing death with a firearm under § 924(j) (Count Three) as multiplicitous of the count based on the lesser-included offense of using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence under § 924(c) (Count Two). The district court granted the government's request. The district court sentenced Defendant to life in prison on Count One and to a consecutive 120 months for Count Two. Defendant appealed.

II.

Defendant raises five challenges to his convictions and sentence on appeal.  He argues: (1) that the government presented insufficient evidence to establish (a) that his killing of Ingram was premeditated and (b) that he acted in neither perfect nor imperfect self-defense; (2) that the district court committed reversible error by admitting hearsay evidence to establish Defendant's tribal status; (3) that the district court plainly erred by admitting prejudicial evidence of Defendant's prior bad acts; (4) that plainly improper prosecutorial conduct made his trial fundamentally unfair; and (5) that the district court gave a substantively unreasonable sentence by sentencing him based on the lesser included offense in Count Two rather than Count Three.  We address each argument below.

A.

Defendant first argues that the government presented insufficient evidence to establish his guilt beyond a reasonable doubt for Counts One and Two.[2]  We review sufficiency of the evidence de novo.  United States v. Xiang, 12 F.4th 1176, 1184 (10th Cir. 2021) (citing United States v. Delgado-Uribe, 363 F.3d 1077, 1081 (10th Cir. 2004)).  We "view[] all the evidence and any reasonable inferences drawn therefrom in the light most favorable to the government," United States v. Christy, 916 F.3d 814, 843 (10th Cir. 2019) (citing United States v. Poe, 556 F.3d 1113, 1124

---

[2]  Count One constitutes the predicate "crime of violence" that the government relies on for Count Two.  In practice, then, Defendant's sufficiency arguments as to both counts rise and fall together.

6

(10th Cir. 2009)), and we do not weigh evidence or consider the credibility of witnesses—which are the province of the jury, Xiang, 12 F.4th at 1184 (quoting United States v. Griffith, 928 F.3d 855, 868–69 (10th Cir. 2019)).

Under "this 'highly deferential' review, we will reverse 'only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Griffith, 928 F.3d at 869). But we will not "uphold a conviction obtained by piling inference upon inference" or where the evidence only "raise[s] a suspicion of guilt." United States v. Smith, 135 F.4th 905, 912 (10th Cir. 2025) (quoting United States v. Anderson, 189 F.3d 1201, 1205 (10th Cir. 1999)).

On appeal, Defendant contends that no rational trier of fact could have found beyond a reasonable doubt that the government met its burden to prove either premeditation or a lack of perfect or imperfect self-defense. We reject both arguments and conclude that the government presented sufficient evidence.

1.

Premeditation requires the government to prove that the defendant engaged in "a prior design to commit murder." United States v. Nichols, 169 F.3d 1255, 1276 (10th Cir. 1999). Premeditation requires "meditating in advance," "deliberation upon a contemplated act," "plotting or contriving," "a design formed to do something before it is done," or a "[d]ecision or plan to commit a crime . . . ." Id. (quoting United States v. McVeigh, 153 F.3d 1166, 1198 (10th Cir. 1998)). The decision "need not exist for any particular period before it is carried into effect." Id. (quoting McVeigh, 153 F.3d at 1198).

7

The government's main theory for premeditation at trial was that Defendant set a trap for Ingram. On appeal, Defendant argues that the government's theory relies on speculation and guesswork that cannot sustain a rational conviction. Defendant further asserts that the government's theory rests on several unsupportable inferences. We disagree.

Defendant first encountered Ingram on the day of the shooting after Ingram pulled up behind him and Meigs at a neighbor's house. Defendant claims that, based on the government's theory, the jury had to infer that Defendant planned for Ingram to show up that night, that he planned for Meigs to leave with Ingram, and that he "planned" to tell Meigs to go get her things out of his trailer. But premeditation "need not exist for any particular period . . . ." Nichols, 169 F.3d at 1276 (quoting McVeigh, 153 F.3d at 1198). Nothing about the government's theory required Defendant to know or to plan beforehand that these events would occur. Instead, the jury could have concluded that Defendant, upset about Ingram's arrival and Meigs' decision to leave him, decided at that moment to set a trap in motion by telling Meigs to go to his trailer to get her things.[3]

Defendant also argues that the government's theory required the jury to infer that Defendant planned for Meigs to come to his trailer and bring Ingram. He

---

[3] Defendant also claims that the government's theory required the jury to infer that Defendant double-locked his door so that Ingram would force it open. Although such an inference may have bolstered the government's theory by suggesting Defendant tried to stage a break-in to justify shooting Ingram, Defendant does not explain why this inference was required for the government's theory.

contends that such inferences do not make sense. But sufficient evidence supports these inferences. The jury could infer that Defendant planned for Meigs to arrive at his trailer to collect her belongings because he told her to "come get all of [her] shit" when he was upset with her, and because she kept many things at his trailer. And the jury could infer that Defendant expected Ingram to go with her because Meigs did not own a vehicle, usually relied on rides, had decided to spend the rest of the night with Ingram, and because he told Meigs he would not be home. These inferences logically flow from the evidence that the jury heard and do not require impermissible speculation or guesswork. See United States v. Hill, 786 F.3d 1254, 1261 (10th Cir. 2015) ("An inference is reasonable if it 'flows from logical and probabilistic reasoning . . . .'" (quoting United States v. Summers, 414 F.3d 1287, 1295 (10th Cir. 2005))).

The evidence likewise supports the inference that Defendant hid his truck to make it appear he was not home. Defendant told Meigs he would not be home and parked his truck in an obscure spot rather than where he normally parked it in front of his trailer. To be sure, Defendant claimed that his truck broke down because it had transmission issues and he was doing "donuts" to blow off steam. But the law does not require the jury to credit Defendant's testimony, particularly where the government produced contradictory evidence at trial. See ROA Vol. II at 1159–1163 (Defendant conceding that surveillance footage of him arriving back at his trailer and driving to the backyard did not show him doing donuts). Because the jury could rationally conclude that Defendant intentionally parked his car outside of view rather

9

than in its normal spot and intentionally lied to Meigs about whether he would be home, the jury could reasonably infer that he did so to hide his presence from Ingram and Meigs.[4]

After thoroughly reviewing the record on appeal, we conclude that sufficient evidence existed for the jury to find premeditation beyond a reasonable doubt.[5]

2.

The government must also disprove perfect and imperfect self-defense beyond a reasonable doubt to support a conviction for first degree murder. See United States v. Maryboy, 138 F.4th 1274, 1290 (10th Cir. 2025). Self-defense requires the defendant to "possess the subjective belief that deadly force was necessary to prevent death or great bodily harm." United States v. Britt, 79 F.4th 1280, 1286–87 (10th Cir. 2023) (quoting United States v. Craine, 995 F.3d 1139, 1156 (10th Cir.

---

[4] Defendant also urges us to conclude that any inferences supporting the government's theory are "in equipoise" with inferences that could be drawn in Defendant's favor. For instance, Defendant testified at trial that he meant for Meigs to get her things out of his truck, not his trailer. Defendant also argues that his testimony that he changed his mind about going to Meigs' cousin's house supports an inference of innocence equally as much as an inference that he intentionally lied to convince Meigs and Ingram that he would not be home. These arguments are foreclosed by the standard of review under sufficiency of the evidence. Under such review, we do not give equal weight to inferences that a jury could draw in either the government or defendant's favor. Instead, we "view[] all the evidence and any reasonable inferences drawn therefrom in the light most favorable to the government . . . ." Christy, 916 F.3d at 843 (citing Poe, 556 F.3d at 1124).

[5] Defendant also argues that the government could not prove that the second shot was premeditated because the evidence failed to establish beyond a reasonable doubt that he did not kill Ingram before firing the second shot. Because we conclude that sufficient evidence supports premeditation as to the first shot, we need not reach this alternative theory.

2021)).  Self-defense is either perfect (when this belief is objectively reasonable) or imperfect (when it is not).  Id. at 1286–87.  In either case, a defendant who acts in self-defense "does not have the requisite mens rea to be guilty of [first]-degree murder."  Id. at 1287 n.2 (quoting United States v. Milk, 447 F.3d 593, 599 (8th Cir. 2006)).

Defendant argues that no reasonable jury could conclude that he did not have at least a subjective belief that he was in danger of serious injury or death when he shot Ingram.  He reasons that video footage showed Ingram forcing his door open, that Ingram often carried a gun, and that Ingram had been aggressive toward Defendant before.

First, the jury found that the shooting was premeditated beyond a reasonable doubt (and we conclude that sufficient evidence supports this determination).  This determination also supports the jury's conclusion that Defendant did not act in self-defense when he shot and killed Ingram.

But that is not all.  The jury could also have credited evidence that contradicts Defendant's claim that Ingram and Meigs broke into his house.  Defendant told Meigs to go to his trailer to collect her things and that he would not be there. Defendant also likely knew that Ingram was Meigs' only ride to his trailer.  And Defendant had previously given Meigs a key and knew she could get into his trailer even without a key.  A jury could infer from this evidence that Defendant expected Ingram and Meigs to go to his trailer, and that Defendant knew they were there to collect Meigs' items, not to harm or steal from him.

11

Further, although some evidence supports Defendant's theory of self-defense, other evidence contradicts the claim that he killed Ingram out of real or perceived necessity. Beginning with the footage of the shooting itself, this footage shows that Ingram had his hands up before Defendant shot him. Defendant then shot Ingram a second time at point-blank range while he lay motionless on the ground with Meigs on top of him. The jury could rationally conclude from this footage that Defendant did not believe he was in danger and instead shot Ingram because he wanted to kill him. After shooting Ingram the second time, Defendant yelled at his body. Witnesses also testified that he was yelling "I told you motherfucker, I told you." ROA Vol. II at 301, 748. While this may have stemmed from adrenaline from the incident, the jury could have viewed this as evidence of Defendant's hatred for Ingram and excitement over killing him.

Evidence following the shooting also supports the conclusion that Defendant did not act in self-defense. The jury heard substantial evidence suggesting Defendant lacked remorse over Ingram's death. For instance, after shooting Ingram, Defendant first called friends and neighbors rather than 911. One witness testified that he had to tell Defendant that he should call 911. A neighbor that heard the gunshots and ran over testified that Defendant "seemed proud" rather than sad about killing Ingram and that he was "talking shit" to the deceased on the ground. Id. at 749, 760–761. Another witness testified that Defendant told him he "let the air out of" Ingram with the second shot and that Defendant acted like he killed Ingram for revenge. Id. at

900.  Yet another witness testified that Defendant seemed like he "was bragging" and "happy" about killing Ingram.  Id. at 865–66.

This evidence supports the conclusion that Defendant did not kill Ingram reluctantly out of necessity and instead killed him out of jealousy and hatred.  Indeed, following the shooting, Defendant accused many other people of sleeping with Meigs and threatened one of these people with a pellet gun—further demonstrating his possessiveness and willingness to act aggressively against perceived romantic rivals.

Finally, the jury heard evidence suggesting Defendant's consciousness of guilt rather than his sincere belief that his actions were justified.  Meigs testified that Defendant tried to intimidate her not to appear as a witness against him.  Another witness testified that he overheard Defendant ask his friend to help him move Ingram's body to the inside of his trailer after the shooting.  And Defendant called one neighbor immediately after the shooting and told him that he "fucked up."

We conclude that sufficient evidence existed for the jury to find a lack of perfect and imperfect self-defense beyond a reasonable doubt.

B.

Defendant also argues that the district court committed reversible error by admitting hearsay as the only proof of his Indian status under § 1153.  To "avail itself of exclusive criminal jurisdiction under § 1153 . . . the government must prove that the defendant is an Indian."  United States v. Hatley, 153 F.4th 1112, 1121 (10th Cir. 2025) (citing United States v. Wood, 109 F.4th 1253, 1257 (10th Cir. 2024)).  We apply "a two-part test for determining whether a person is an Indian for the purpose

13

of establishing federal jurisdiction over crimes in Indian country." Id. (quoting Wood, 109 F.4th at 1257). Under this test, the government must prove that the defendant "(1) has some Indian blood; and (2) is recognized as an Indian by a tribe or by the federal government." Id. (quoting United States v. Prentiss, 273 F.3d 1277, 1280 (10th Cir. 2001)). We recently explained that the government must prove that the defendant was recognized as an Indian by a tribe or by the federal government "at the time of the offense." Id. at 1116.

At trial, the government attempted to prove Defendant's Indian status in part by relying on a letter from the Cherokee Nation attorney general stating that Defendant had been a Cherokee Nation citizen since September 12, 1994. A government witness also testified to the contents of the letter. The district court admitted this evidence over Defendant's hearsay objection.

On appeal, the government concedes that the district court erred in admitting this evidence based on our recent precedent. See Appellee's Answering Br. at 33 (citing United States v. Harper, 118 F.4th 1288, 1295 (10th Cir. 2024)). Even still, the government contends that this error was harmless. To demonstrate harmlessness for a non-constitutional error, the government must demonstrate, "by a preponderance of the evidence, that the substantial rights of the defendant were not affected." United States v. Walker, 85 F.4th 973, 982 (10th Cir. 2023) (citing United States v. Glover, 413 F.3d 1206, 1210 (10th Cir. 2005)).

This dispute focuses on whether the district court's error was harmless as to the second prong of the test for determining Indian status. Defendant argues that the

14

inadmissible evidence was the only proof on which the government relied that could establish Defendant's tribal membership at the time of the offense and so its admission was not harmless. The government argues that the erroneous admission was harmless because it also relied on Defendant's Certificate of Degree of Indian Blood ("CDIB"), his CDIB card, his Cherokee citizen number, and testimony from law enforcement officers about Defendant's Indian status.

Ultimately, any error was harmless. Although the CDIB evidence does not prove Defendant's tribal membership at the time of the offense (and only shows that Defendant has some Indian blood), the government also relied on records maintained in the Cherokee Nation database. Defendant did not object to this evidence during trial and does not challenge the admission of this evidence on appeal. This evidence shows Defendant's Cherokee Citizenship number and lists his citizenship date as September 12, 1994—the same date of enrollment found in the erroneously admitted letter.

The government also relied on testimony from the law enforcement officers that investigated the shooting. Special Agent Hannah Kuhrt of the FBI determined that Defendant was a member of the Cherokee Nation during her contemporaneous investigation of the shooting incident. Lieutenant Hendley of the Cherokee County Sheriff's Office received a call on the night of the shooting advising him that Defendant was "[n]ative" and that he needed to release Defendant to the Cherokee Nation. Investigator McNiel of the Cherokee Nation Marshal Service also testified that Defendant was a member of the Cherokee Nation on the night of the shooting.

15

This evidence overcomes the government's burden of proving harmlessness by a preponderance of the evidence. The testimony from law enforcement officers independently established Defendant's tribal membership at the time of the offense. And the Cherokee Nation database records duplicated the date of tribal membership provided in the erroneously admitted letter and testimony. See Walker, 85 F.4th at 983 (concluding that duplicative alternative evidence about tribal recognition rendered erroneously admitted evidence harmless).

C.

Defendant also argues that the district court plainly erred by admitting prejudicial evidence of his prior bad acts. "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. McGlothin, 705 F.3d 1254, 1260 (10th Cir. 2013) (quoting United States v. Frost, 684 F.3d 963, 971 (10th Cir. 2012), overruled on other grounds by United States v. Bustamante-Conchas, 850 F.3d 1130 (10th Cir. 2017)). "An error is plain if it is clear or obvious under current, well-settled law." United States v. Walker, 74 F.4th 1163, 1200 (10th Cir. 2023) (quoting United States v. Thornburgh, 645 F.3d 1197, 1208 (10th Cir. 2011)). "A law is well-settled in the Tenth Circuit if there is precedent directly on point from the Supreme Court or the Tenth Circuit, or if there is a consensus in the other circuits." Id. (quoting United States v. Egli, 13 F.4th 1139, 1146 (10th Cir. 2021)).

Prior to trial, the government moved to introduce evidence under Federal Rule of Evidence 404(b).  Rule 404(b)(1) prohibits reliance on "any other crime, wrong, or act" as evidence of a person's character, Fed. R. Evid. 404(b)(1), but Rule 404(b)(2) permits reliance on such evidence for purposes including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident,"  Fed. R. Evid. 404(b)(2).  Even if a party intends to rely on evidence for a permitted purpose under Rule 404(b)(2), the court may still exclude such evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."  Fed. R. Evid. 403.

The magistrate judge denied the government's motion as to certain pieces of evidence.  Relevant here, the magistrate judge excluded evidence that in "[a]pproximately April or May 2023," Defendant told Meigs "that he wished he would have blown off her head," "attempted to drag her down the road by her hair," and threatened to cut her head off with an ax.  ROA Vol. I at 256–57.  The magistrate judge found that this evidence "may [have] very well" satisfied 404(b) but that its "prejudicial effect [was] tremendous" and excluded it under Rule 403.  Id. at 257.  The magistrate judge also excluded evidence that Defendant burned Meigs' neck with a blowtorch.  The magistrate judge reasoned that the government had not specified whether this incident took place before the shooting, so the court could not determine whether this incident was evidence of guilt or witness intimidation.  It once again excluded this evidence relying on Rule 403.

17

But the magistrate judge granted the government's motion to admit some of the evidence including that, on October 15, 2023, Defendant grabbed Meigs by the arm, threatened to slit her throat, said he should have blown her head off, and chased her through a field. Meigs told law enforcement that Defendant was trying to intimidate her because she had been scheduled to testify against him.

The magistrate judge concluded that this evidence did not constitute "prior" bad acts evidence under Rule 404(b) because Meigs would testify that Defendant acted to prevent her from testifying against him, rendering these acts "inextricably intertwined with the crimes charged." Id. at 265. The magistrate judge further found that, even if these acts constituted "prior" bad acts under Rule 404(b), they went to the proper purposes of showing motive and plan. The magistrate judge found that the probative value of this evidence was "significant because elimination of a witness is probative of guilt" and that "[a] limiting instruction [could] advise the jury on how to apply the evidence." Id. Neither party appealed the magistrate judge's order.

At trial, the jury heard some of the bad-acts evidence that the magistrate judge had excluded. For example, the government—consistent with the magistrate judge's pretrial order—asked Meigs about the October 2023 incident of witness intimidation. In response, however, Meigs testified to several acts by Defendant that the government's pretrial motion did not tie to the October 2023 witness-intimidation incident and that the magistrate judge had excluded. This included that Defendant pulled Meigs by her hair, "[p]icked up an ax," and burnt Meigs with a torch. ROA Vol. II at 640.

18

During the government's cross-examination of Defendant, the government asked him about his attempts to intimidate Meigs and to "make sure that she knew better than to ever go with any other man again . . . ." ROA Vol. II at 1202. The government asked if this was why Defendant pulled Meigs' hair and burned her with a blowtorch. Defendant testified that these acts were all part of "that same incident." Id. In its closing argument, the government again referred to Defendant burning Meigs with a blowtorch.

Although Defendant did not object to any of this evidence during trial, he argues on appeal that the district court plainly erred in admitting it and that this error's obviousness is shown by the magistrate judge's pretrial rulings. We find no plain error in the admission of this evidence.

Defendant cites no settled law holding that a magistrate judge's pretrial order subsequently binds the district court at trial or that it was plain error for the district court to change its mind as to the admissibility of this evidence during trial. See Ohler v. United States, 529 U.S. 753, 758 n.3 (2000) (explaining that "*in limine* rulings are not binding on [a] trial judge" and that "the judge may always change his mind during the course of a trial"). Indeed, this evidence came out during questioning about the October 2023 witness-intimidation incident that the magistrate judge ruled *admissible*. Thus, even if we construed the failure to adhere to the pretrial order as plain error, the district judge acted consistently with the pretrial order in admitting this evidence given Meigs' testimony that it related to the October 2023 incident.

19

Aside from relying on purported inconsistencies with the magistrate judge's pretrial order, Defendant fails to argue on appeal why admission of this evidence violates well-settled law applicable to Rule 404(b). It is well-established that "[e]vidence of threats to a prosecution witness is admissible as showing consciousness of guilt . . . ." United States v. Smith, 629 F.2d 650, 651–52 (10th Cir. 1980) (citing United States v. Rios, 611 F.2d 1335, 1349 (10th Cir. 1979); United States v. Davis, 487 F.2d 112, 125 (5th Cir. 1973); United States v. Cirillo, 468 F.2d 1233, 1240 (2d Cir. 1972)). And consciousness of guilt may show "motive, intent, plan, or knowledge . . . ." United States v. Esparsen, 930 F.2d 1461, 1476 n.16 (10th Cir. 1991). The magistrate judge found precisely this when he allowed bad-act evidence surrounding the October 2023 witness-intimidation incident. In his order, the magistrate judge concluded that Defendant's actions against Meigs related to witness intimidation and showed motive "stemm[ing] from [Defendant's] desire to control" Meigs as well as Defendant's plan to kill Ingram and eliminate Meigs as a witness. ROA Vol. I at 265. We agree and conclude that the district court did not plainly error by admitting this evidence under Rule 404(b).

Defendant also fails to show that admission of this evidence was plainly erroneous under Rule 403. Even when a party preserves a Rule 403 error on appeal, we afford the district court "broad discretion" in making Rule 403 determinations. United States v. Cherry, 433 F.3d 698, 702 (10th Cir. 2005) (quoting United States v. Ramirez, 63 F.3d 937, 943 (10th Cir. 1995)). And "we do not balance the probative value" of evidence "against the risk of unfair prejudice in the first instance." United

20

States v. Herrera, 51 F.4th 1226, 1262 (10th Cir. 2022).  Instead, "we give the evidence its maximum reasonable degree of relevance and its minimum reasonable danger of unfair prejudice."  United States v. Tee, 881 F.3d 1258, 1273 (10th Cir. 2018) (citing United States v. Cerno, 529 F.3d 926, 935–36 (10th Cir. 2008)).

Defendant cites no authority establishing that admission of this evidence plainly violated well-settled law.  On the contrary, witness intimidation can be highly probative of the Defendant's guilt.  This magistrate judge concluded as much when he found admissible Defendant's actions concerning the October 2023 witness-intimidation incident.  The district court's limiting instruction further diminished any prejudice because it allowed the jury to consider testimony of alleged domestic abuse by Defendant against Meigs "solely to explain the[ir] relationship . . . ."  ROA Vol. II at 830; see also United States v. Johnson, 157 F.4th 1309, 1320 (10th Cir. 2025) ("We must also consider prejudice in light of the district court's limiting instruction. . . . [a]nd we presume the jury follow[s] [instructions.]" (citing Herrera, 51 F.4th at 1273)).  The district court did not plainly err in admitting this evidence.[6]

---

[6] Defendant cites two other instances of the government eliciting bad-act evidence.  In the first, the government asked Meigs if Defendant ever chased after her before the shooting incident.  The government appears to have been trying to elicit testimony about an incident where Defendant chased Meigs out of his trailer and then Ingram attacked Defendant.  But in her initial response, Meigs mentioned that Defendant had dragged her by her hair—an act that the magistrate judge excluded in its order.  This did not provoke an objection or any further discussion by the government.  We conclude that, even if plain error, admission of this evidence of hair pulling did not affect Defendant's substantial rights.  The government did not intentionally elicit this testimony or follow-up on it, the district court provided a

D.

Defendant also argues that the government engaged in plainly improper conduct that made his trial fundamentally unfair. Prosecutorial misconduct can violate a defendant's due process rights by "infect[ing] a trial with unfairness and den[ying] the defendant the right to a fair trial." United States v. Currie, 911 F.3d 1047, 1055 (10th Cir. 2018) (citing United States v. Anaya, 727 F.3d 1043, 1052 (10th Cir. 2013)). On plain-error review, "reversal is warranted only when [1] the prosecutor's statement[s] [are] *plainly improper* and (2) the *defendant* demonstrates that the improper statement[s] affected his or her substantial rights." Christy, 916 F.3d at 826–27 (quoting Anaya, 727 F.3d at 1053). We examine allegedly improper statements in context, Currie, 911 F.3d at 1056 (citing United States v. Young, 470 U.S. 1, 11 (1985)), and we do "not lightly infer that a prosecutor intends

---

limiting instruction for all domestic abuse evidence, and the jury also heard that Defendant pulled Meigs' hair in relation to the October 2023 witness-intimidation incident. As discussed above, the district court did not plainly err in admitting this instance of hair pulling. That the jury heard about a second, earlier incident of hair pulling does not undermine our confidence in this case's outcome. See United States v. Hill, 749 F.3d 1250, 1263 (10th Cir. 2014) (explaining that relief under plain error requires a party to show "a reasonable probability that but for the error claimed, the result of the proceeding would have been different," and that this means "a probability sufficient to undermine confidence in the outcome" (first quoting United States v. Trujillo-Terrazas, 405 F.3d 814, 819 (10th Cir. 2005); then quoting United States v. Hasan, 526 F.3d 653, 665 (10th Cir. 2008))).

Defendant also highlights another question from the government about the October 2023 witness-intimidation incident. This question elicited a response from Meigs that Defendant said he "should have blown [her] head off." As explained above, we see no plain error in admitting bad-act evidence related to the October 2023 witness-intimidation incident.

an ambiguous remark to have its most damaging meaning," id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974)).

Defendant contends that the government's questions elicited "improper and prejudicial testimony that [was] not admissible for a proper purpose." Appellant's Opening Br. at 41 (citing United States v. Kepler, 74 F.4th 1292, 1315 (10th Cir. 2023); United States v. Crutchfield, 26 F.3d 1098 (11th Cir. 1994)). As discussed above, the government asked questions consistent with the pretrial order and the district court did not plainly err by admitting the bad-acts evidence that these questions elicited. So the prosecutor's questions were not plainly improper.

Defendant also argues that the government made plainly improper statements during closing argument and encouraged the jury to convict Defendant based on his prior bad acts. During its closing, the government distinguished first degree murder from voluntary manslaughter by arguing that the shooting did not occur in the heat of passion. The government told the jury that both Ingram and Defendant did "very inappropriate things" to Meigs. ROA Vol. II at 1281. The government then juxtaposed actions of Ingram with Defendant's actions, including that Defendant burned Meigs with a blow torch, and told the jury that they could decide whose actions were worse.

The government's statements about Defendant's actions were not plainly improper. Although the magistrate judge initially excluded some of these acts, the district court admitted them into evidence at trial. As explained above, the district court did not plainly err in doing so. References to admitted evidence during closing

23

argument are not plainly improper.  See United States v. Jones, 194 F.3d 1178, 1182 (10th Cir. 1999) ("Because references to admitted evidence during closing argument are clearly proper, we conclude that the prosecutor did not commit misconduct."), vacated on other grounds, 530 U.S. 1271 (2000).

As to the government's suggestion to the jury that it could decide whose actions between Ingram and Defendant were worse, we conclude that, considered in context, these statements were not plainly improper.  Read as a whole, the government did not encourage the jury to find that Defendant was "worse" and therefore guilty.  Instead, the government was describing Ingram and Defendant's behaviors as part of a "months long thing" and not something that occurred in the heat of passion.  ROA Vol. II at 1282.  In context, these statements encouraged the jury to find the shooting did not occur in the heat of passion.  They did not encourage the jury to convict Defendant because he treated Meigs worse than Ingram.

For these reasons, we reject Defendant's argument that his trial was fundamentally unfair.

E.

Defendant's final argument is that the district court erred when it dismissed the § 924(j) count against him in favor of the § 924(c) count.  Defendant claims this decision resulted in a substantively unreasonable sentence.  Count Two of the government's superseding indictment charged Defendant under § 924(c), which criminalizes using, carrying, brandishing, and discharging a firearm "during and in relation to any crime of violence . . . ."  § 924(c)(1)(A)(i)–(iii).  Count Three of the

government's superseding indictment charged Defendant under § 924(j), which criminalizes acts causing death "in the course of a violation of subsection (c) . . . ." § 924(j).  The jury convicted on both counts.

Because sentencing under both counts would result in multiplicitous convictions and violate the Double Jeopardy Clause, see Barrett v. United States, 607 U.S. 128, 138–139, 149 (2026) (concluding that Congress has not authorized convictions under both §§ 924(c) and (j) for a single act that violates both provisions), the government moved to vacate Count Three—the § 924(j) count for causing death, but wished for Count Two to remain.  Section 924(c) imposes "low-end rigidity" in sentencing by requiring mandatory minimum sentences that run consecutively to the predicate crime of violence.  See § 924(c)(1)(A); Barrett, 607 U.S. at 145.  Section 924(j), meanwhile, "eschews mandatory penalties in favor of sentencing flexibility."  Barrett, 607 U.S. at 144–145 (quoting Lora v. United States, 599 U.S. 453, 462 (2023)).  The government sought to dismiss the § 924(j) count to guarantee that Defendant received at least the same mandatory consecutive sentence he would receive had he discharged a weapon under § 924(c) without causing death.

The district court granted the government's motion and vacated Defendant's conviction under § 924(j).  It then sentenced Defendant under Count Two to ten years' imprisonment to run consecutively with Defendant's conviction under Count One.  On appeal, Defendant argues that the district court erred by vacating the § 924(j) count rather than the lesser included offense under § 924(c).

25

Defendant's argument fails under the Supreme Court's recent Barrett decision. There, the Court addressed "whether a defendant who commits a single act that violates both § 924(c)[] and § 924(j) may be convicted only under one provision or the other, or instead may suffer two convictions." Barrett, 607 U.S. at 131. After concluding that a defendant may not be convicted under both provisions, the Supreme Court rejected arguments based on "fears that defendants convicted of and sentenced under subsection (j) will be rewarded with more lenient sentences than those convicted of the less serious subsection (c)(1) offense." Id. at 144. The Supreme Court relied in part on a prosecutor's ability to do precisely what the government did here. As the Supreme Court explained: "[i]f, in a given case, prosecutors fear that a subsection (j) sentence will dip below what subsection (c)[] would otherwise guarantee, they are free to choose subsection (c)[]'s low-end rigidity over subsection (j)'s high-end flexibility." Id. at 145 (citing Ball v. United States, 470 U.S. 856, 860–61, nn. 7–8 (1985)).

Defendant contends that Barrett does not reach the argument he presents on appeal because Barrett's holding only addressed whether a jury may convict a defendant under both §§ 924(c) and (j). But "[w]e are bound by Supreme Court dicta almost as firmly as by the Court[']s[] outright holdings, particularly when the dicta is recent and not enfeebled by later statements." Schell v. Chief Just. & Justs. of Okla. Sup. Ct., 11 F.4th 1178, 1191 (10th Cir. 2021) (quoting Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1125 (10th Cir. 2015)). This "is particularly true when the 'dicta squarely relates to the holding[] itself, and therefore is assuredly not gratuitous.'" Id.

26

(quoting <u>Bonidy</u>, 790 F.3d at 1125).  The Supreme Court's explanation that the government may "choose" subsection (j) over subsection (c) is both recent and related to its justification for its holding.  These statements from <u>Barrett</u> therefore bind us.

Thus, we conclude that the district court did not err in vacating Count Three and sentencing Defendant under Count Two.  Given that Defendant has shown no errors by the district court in sentencing, we reject his substantive reasonableness challenge.

AFFIRM.